Good morning. May it please the court, Timothy Arhanian on behalf of Appellant and Defendant Richard Segal. I believe that the central issue in this case is whether or not the lease agreement, which is the subject of the underlying action, is a lease under the law or a sales agreement with a security interest. I believe that under the cases cited, in particular the Addison case, which is California, which relies on Tillery and Tulsa, in order to determine whether or not that agreement is a sales agreement or a lease, the standard is whether or not the lessor retained a meaningful residual interest in the goods at the expiration of that lease. See, the difficulty with those two cases is that they pertain to a pre-Article 10 or Article 9. I get them mixed up. But anyway, pre-correct article revision, which makes the – which specifies with some clarity what factors are to be considered. Correct. Now, the Addison case, which is a California case, which is a post-revision case, actually relied on those cases, and in dicta, at least, states that, in our view, the amendment of which you just noted was intended to clarify the process of determining the nature of these contracts, not to change the substance of the law. So the law is still good. The code was changed in order to make it easier to determine whether or not we have such an interest or not. And the code makes it pretty darn clear that if you can terminate a lease before its term, it's a lease and it's not a sale. Actually, I believe what it says is – it lists four conditions in the UCC, and it says if either of these four exist, then it's not conclusively determined to be a security interest agreement. None of those conditions exist here. In the Tullary case, in the Tulsa case, and in the Addison case – and, in fact, there's three or four cited – those cases all went off on the fact that if, at the time the lease is terminated, if, in fact, at that point, a sale must take place of the goods, and therefore, the lessor cannot have any revisionary interest in the product, it is, in fact, a sales agreement. And that's exactly what we have here. Under both of the provisions in this lease, it says either under early termination or upon termination of the lease, that truck, in this case, was to be sold. And if the amount that was gained from that sale was less than the residual amount in the lease, the lessee was responsible. If it were an early termination. Actually, in both. If, in looking at the Tully's supplemental excerpts of record, which does a better job of this, of having it attached, on paragraph 11, it says expiration of lease, and it says lessor may, at its option, sell such leased vehicle in an arm's-length transaction within 30 days after expiration of the lease thereof, or may appoint lessee as lessor's agent to sell such leased vehicle. It has to be sold, either by the lessor or by the lessee. And then it says – Wait a minute. How do you translate may at its option into has to? It says may at its option. Sell it itself or appoint the lessee. No, it says may at its option. Sell. No, right. No, I understand it. It seems to me that there's no obligation to sell it at all. Well, the way I read it, it says the – it's going to be sold either at the lessor's option by the lessee or by the lessor. Well, that's – with respect, I don't read it that way. It seems to me something that may at its option do something, that it's not required to do the something. Well, but the only or that follows gives two options. It may sell it or may appoint lessee. It may. It may do either of those things. If it decides to sell, then it may sell it. Then it may not do either of those. Correct. But this doesn't say that one of the options is not to sell. But that's what the point of may at its option is, isn't it? To give them the option to do one of the things that follows or not. If it stopped at saying may at its option sell such leased vehicle, period, you'd have no leg to stand on at all. So the only question is whether by adding more than one option under the things that it may do if it chooses, that that suddenly turns the may if it chooses into a has to. Okay. And assuming your interpretation would be correct, then it would follow that in this paragraph, there would be some language as to what would happen if, in fact, the lessor decided not to sell it and keep it. There is no, there is nothing there. Which means the lessor can do whatever he wants to with the vehicles. It can trash them, it can sell them, it can keep the money, it can do anything it wants to. Correct. But, but. Because the vehicles belong to the lessor. Correct. But the problem with that is, if you look at the early termination provision, which is in paragraph 15, it sets out the same exact thing that the lessor can sell it or the lessee can sell it on behalf of the lessor. And then it has the third option. Okay. It says the lessor can keep it, but if it does, the lessee must pay the residual value. Also, if they knew how to write it in one place, they could have written it the other. Correct. Which leads me to say that I'm correct in my interpretation that the, if it expires upon its term, it had to be sold either by the lessor or the lessee. If you look at the early termination provision, it also says it shall be sold by either one, or if it's kept, the lessee has to pay the residual value. And that's the key here, because it's forcing the risk of gain or loss on the lessee in the goods. That's a sale. That's no longer a lease. Well, only if we agree with your reading of may instead of shall. Because in paragraph 15, it says lessee shall attempt to sell the vehicle, et cetera, but yet in paragraph 11, it says the lessor may at its option. And so we would have to read those as being equivalent to get to where you'd like to go. We'd have to read may as shall. No. No, you don't. If may refers to the only options in the paragraph, meaning we may sell it or you sell it. It's one of those two options. So if I tell my daughter that she may rent a movie or read a book, she can't. You may, if you'd like, read a book or rent a movie. She can't say I'd like to take a nap because it's not one of the two listed options. I mean, it just isn't the way people read or understand this kind of a sentence, it seems to me. Again, I guess if you said you've got two options, you go to the movie by yourself or you go to the movie with your dad or you go with me. Those are the two options you have. I mean, if we're going to the movie, that's it. Those are your two options. The problem with your interpretation is that it doesn't say what would happen in paragraph 11 if, in fact, the lessor didn't or the lessee didn't sell it. Then we would have a contract that doesn't have. It's inherent in the nature of a lease that the lessor gets it at the end. It belongs to them. Correct. When they're done leasing it, it's still theirs. Correct, unless the agreement says that it must be sold, and I believe that's the way you interpret it, especially if you look at the early termination provision that, in fact, deals with the situation is what would happen if either of those two options don't occur, and still in that event they're placing the risk of loss or gain on the lessee. I believe under that interpretation of this agreement that the agreement does constitute a sales agreement and not a lease, and therefore that the court erred when it applied Article 10 rather than Article 9. There's been one other argument mentioned as to a waiver as to whether or not it's proper to argue, basically, that the notice was deficient below. I would, in response to that, argue that if, in fact, the court erred, and this is a sales agreement and Article 9 applies, Ford Motor under UCC Article 9 has the burden of proof of meeting all the requirements in Article 9. It's their burden to come forth and show that the notice was correct, that the sale was commercially reasonable in all respects, and all of the other requirements of Article 9. But that issue was never raised so far as I could tell in the district court. We never got to it because the district court held Article 10 applies. So we never got to commercial reasonableness. We never got to notice. We never got to any of the Article 9 arguments because the court held Article 10 applies. Therefore, I'm holding that Defendant Siegel has the burden of proof to come forward and establish that the sale was not reasonable because mitigation and defense, the burden of proof would be on the defendant. If, however, again, the court erred, it switches the whole burden of proof. This comes up on summary judgment, right? Correct. I mean, which is the ballgame. So if there's any even ifs to be had, shouldn't they have been raised in the district court? Yes and no. And in this instance, we, being Siegel, wasn't obligated to raise it because it is part of their case in chief. Plaintiff's case in chief must come forward in the summary judgment motion and show under Article 9 that it's complied with all the provisions, including the notice. So on their papers, on the face of their papers, when they've got their notice there and on their own evidence where the sales were not done in accordance with the evidence, with their notice, they have not met their burden of proof showing compliance under Article 9. So I would argue that the case that they cite is distinguishable because in that case, the burden wasn't on the moving party to present the evidence. It was just another argument that the defense was making in opposition to it. Here, and the critical distinction is that Ford was obligated to show affirmatively that its notice, along with all of the other requirements of Article 9, were met. On the face of its papers, looking at de novo, it's clear it's not because we have their own evidence with the notice and we have their own evidence with the fact that the sales were not done in accordance with their own notice. I believe that those are the two critical issues in this case. I'd like to reserve my remaining four minutes, if I may, if rebuttal is necessary. Thank you. Ms. Knopf? Hi. Good morning. Katherine Knopf for Plaintiff and Appellee Ford Motor Credit Company. And I would agree that the main issue is whether this is a lease or an agreement creating a security interest, that Addison case did happen to distinguish the document in front of it on the basis that it was a lease. In the case of Utilitarian Tulsa, the lessor was required to sell the vehicle, but that isn't actually part of the test. That just happened to be the situation in its particular case. Regardless of whether or not the lessor has to sell the equipment or vehicle at the end of the lease, the meaningful residual interest test doesn't actually say anything about what the lessor does with the stuff after the lessor gets it back. It just has to have the two-part test saying whether the agreement allows the lessee to acquire equity in the goods and whether the subsequent option to purchase price is nominal. Here there was no option to purchase nominal or not. And, in fact, all of the goods were ultimately sold for $621,000. So clearly what they were sold for was not nominal. They retained significant value, and that value belonged to Ford Credit. And, in fact, when Ford Credit sold the trucks and Aerofire machines, they kept that money. Allowing the lessee to acquire equity in the goods, that was the entire distinction of the Tillery and Tulsa cases and the argument that Siegel raised, which was simply because you are required by the lease to share in the ultimate gain or loss because you're required to pay additional lease fees if the equipment doesn't sell for its estimated value, perhaps because of how you used or overused the equipment, you're required to pay that additional amount. That doesn't qualify as gaining equity in the vehicle or the goods, whatever they may be. Do you agree or disagree that the vehicle must be sold at the end of the lease term, or can it simply be returned to the lessor? I actually believe it has to be sold, even despite the language may, simply because otherwise it doesn't say how much the lessee is going to be required to pay at lease end, and the lessee is going to be required to pay if the equipment couldn't be sold for its estimated value. The lessee has to make up the difference, and there's no way to tell what the fair market value was and what the difference would be that the lessee is going to be obligated to pay without sale of the equipment. So here I think sale was simply a manner of fixing the amount that the equipment and trucks were worth. But in your view, that still doesn't make it a security interest. Certainly not. I mean, this agreement says lease all over it, and if you apply the first four factors under UCC Section 1201.37, here progreens could end the agreement at any time on 30 days' notice. That's indicative of a lease as opposed to an agreement creating security interest. The original lease term didn't equal or exceed the remaining economic life of the equipment at lease end. They still had plenty of economic value left, as can be demonstrated by the fact that they were sold for so much. Progreens wasn't required to renew the lease or become the owner of the equipment at lease end. In fact, the equipment had to be returned to Ford Credit, and progreens neither had an option to buy the equipment or to renew its lease for little or no money. Progreens had no option but to return the equipment. So each of those factors weighs towards finding a lease agreement, in addition to the fact that it's called a lease agreement, as opposed to an agreement creating a security interest. Then the two additional factors that I mentioned of the meaningful residual interest test show that Ford Credit kept a meaningful residual interest in these pieces of equipment, having really nothing to do with whether they were required or not to sell them after they got them back. That's an additional distinction that the Addison case happened to pull up to distinguish its situation before it. But it doesn't have to apply in order for those four factors and the additional two of the meaningful residual interest test to apply. Additionally, counsel raised the fact that it was our burden to Ford Credit on summary judgment to show that Article 9 didn't apply. We didn't have to raise everything that didn't apply and knock it down. I mean, clearly this was a lease. We established that it was a lease. And given that Article 9 didn't apply in that situation, other additional requirements like whether the notice of sale was defective, which was not raised below, didn't have to be raised simply to be shot down on summary judgment. In addition, Article 9, which would have placed the burden on Ford Credit of proving its actions in the sale were commercially reasonable, didn't apply. The burden was on Siegel on summary judgment simply because it was a matter of an affirmative defense on common law. He had to show that Ford Credit had not taken reasonable steps to mitigate its damages. And the trial court correctly found that there was no disputed evidence, and the evidence in the record showed that Ford Credit had, in fact, acted reasonably. Ultimately, regardless of whose burden it was, the only evidence in the record showed that Ford Credit acted reasonably in selling all these pieces of equipment and trucks. And, in fact, below, Siegel conceded the reasonableness of the sale of the trucks and the tractor. The only issue that he disputed was with regard to the sale of the verification equipment. And in that regard, the notice of sale said it was going to take place at a private sale, and the airifiers were the only equipment sold at a private sale. So they did comply, in fact, with the notice. Is there a question as to whether the method of private sale is itself reasonable? Was there a question about it? Yeah. You said the only issue that was raised was whether it complied with the notice. And I'm asking whether there was additionally a question raised about whether having a private sale as distinct from a public sale or auction was itself a reasonable choice. There was evidence in the record that it was reasonable. There was no evidence in the record that it was not reasonable. The evidence showed that Mr. Hill, the representative of Ford Credit, decided that because these pieces were scattered throughout the United States and also very unusual pieces of equipment and very large, that a private sale would be the best method of selling them. That wasn't disputed. And, in fact, they had bids from five different bidders, as I recall. And the highest bid, I think, exceeded the previous ones by more than $16,000. Six of the air flyers were damaged, so they were sold for somewhat less, which was the highest bid was still $1,000 more than the next highest bid. I don't know that there was any evidence in there that it was sold in any manner other than reasonable. And the only evidence in there was that the method of sale was reasonable, as the district court recited in its order. The final thing about the sale of the air flyers was that Siegel endorsed the method of sale that was in the lease by signing off on his guarantee, which happened to follow one of the pages of the lease directly on the lease. So he saw the method of sale in the lease, which could be either private or public, with or without notice to the lessee. And, in fact, the sale conformed to what the lease said. The final thing that was raised on appeal about the sale of the air flyers was that Ford Credit failed to advertise them, but the law is clear that there's no need to advertise a private sale as opposed to a sale to the public at large. And there was also some suspicion that Ford Credit may have given the highest bidder preferential treatment. But in that section of the brief, you'll notice there isn't any citation to the record. And having a suspicion without grounding it in facts that somebody may have received preferential treatment doesn't raise to the level of fact necessary to defeat summary judgment by raising a tribal issue. And there was no evidence, in fact, that anyone had received preferential treatment. And, in fact, below, Siegel conceded that the bids had been kept secret throughout the process. Are there any questions further? I don't think so. Thank you very much. Mr. Hannigan. Very briefly, thank you. I think it is critical that the concession has been made by Ford Motor here that, under their interpretation of this quote-unquote lease, that the collateral was required to be sold. I guess I just don't understand what difference that makes. I've never been even focused on that paragraph or see what difference it makes. Because if you can terminate the lease before it expires, and you have to surrender the vehicle upon termination, the fact that the lessor can, may, must sell it, doesn't seem to me to have anything to do with whether it was a sale or not. You had no option to renew. You had no right to buy. And you only had some kind of equity if it was an early termination, not if it were a termination at the end of the term. So for all those reasons, it seems to me it's a lease is a lease. If I may, all of those considerations that you raised, as well as what counsel just said, are set forth in UCC 1201, section 1201. And it lists certain factors to look at as to whether or not it's a lease or not. That's right. But then it says, if none of these exist, which none of them do here, a security interest will not conclusively be found to exist. In such a case, the court must then resort to an examination of the facts of the case to determine whether the lessor had retained a meaningful residual interest. That then gets us into the Addison analysis and all those cases cited that go off on whether or not it's required that the collateral be sold. That's exactly what we go through that UCC. You find that there's no, it's not conclusively a security interest. Then you go to the meaningful residual test, which the key there is, if it's required that the collateral must be sold at the end, which Ford Motor has conceded that is what happened here. Then under Addison, and there's six cases from all over that cite that the key there is, if it says that the property must be sold, and then what happens is the lessor says, okay, let's look at how much money I got, and if I got less than the residual amount in the lease, lessee, you have to pay me. If it's more, you get to keep the surplus. That's a sale. This agreement, when it was signed, there was no way ever Ford was ever going to get back possession of those vehicles to keep. It was required to be sold, and the risk of loss or gain was transferred to the lessee. Under Addison, Tillery, Tulsa, Keeling, In re, there's five or six on page 1298 cases from all jurisdictions that go off on that requirement for sale. And the key here is, and I'll quote from the Addison decision, as one court observed, quote, from the moment the agreement was signed, parentheses, in Tulsa, lessor lost any reversionary interest in the property itself. Any expectancy that someday he might do as he pleases with it. And the reason was because he was required to sell it. It was over. That lessor was never going to take that property back before he's conceded that point. And when you look at the lease, on top of that, it then says, by the way, lessee, you get to pay me money if I don't get this, if there's a loss on this sale, or if there's a gain, I'll give it to you. That is a sale, no matter what they call it. Under the meaningful residual interest test, which we have to go to because the other factors aren't conclusive, then we have that. Again, with respect to the burden below, if the court rules that it is a sales agreement, and Article 9 applies, and we've got error by the court because it applied the wrong legal standard. And then if you look at Article 9, it does say, specifically, that if the sale is put into issue, the secured party has the burden of establishing all of the aspects of the sale were proper, including notice. And that's in UCC Section 19. And what, in a nutshell, do you think was wrong with the notice in this case? Oh, I've got a Supreme Court case and a court of appeal case in California right on point, where the notice, as in their own moving papers in certainly judgment, there's two notices. One was given to the guarantor, one to the lessee. It said that all of the collateral, the tractor, the airifiers, and the trucks were going to be sold at a private sale. As it turned out, the trucks were sold at a public sale along with the tractor, and the airifiers were sold at a private sale. I have two cases right on point that say if you give notice of a private sale, it's all got to be private sale. You can't do some private and some public. What difference does it make? I mean, there's nothing in the record to show that you would have gotten any more of an offset if some other or different method of notice or sale had been accomplished. The difference is the law says, and I quote. No, no. Understand. Suppose that it was wrong. Okay. My question is, is there any evidence that it would have made any difference in the amount of the offset? And I can't – I don't have the evidence because of the law. Well, it was summary judgment. Again, that's my point. If I may, I'm – the law says the reason you have to give proper notice is so my client can go to the sale to make sure that it's done right. If the notice isn't right, he doesn't know when – where the public is. I know, but you now know. Okay. By the time you got to summary judgment, you now know how it was done. My question is, knowing how it was done, is there any evidence in the record to show that the amount recovered would have been any different if different notice or a different process had occurred? Okay. No, but that's not a fair question because my client wasn't put in a position to – in order to answer that question, my client – it's not enough to be here after it's all happened and say did something go wrong. There's case law that says the reason the notice requirement is strictly enforced and if you don't follow it, failure to comply. So what would you do now? Oh, no. He would have gone to the sale. No, no. I know that. But let's say the summary judgment wasn't granted and you went to trial. What would you be trying to prove? I would show that the notice was done wrong. Okay. As a matter of law. And then so what? As a matter of law. Zero damages? Correct. Failure to comply with the notice requirement will act as an absolute bar to a deficiency judgment. That's how serious this is. And the reason it's so serious is for the position I'm in now. It's not fair to say to a debtor, well, what facts do you have to suggest that it was done unfairly? Because the response is, I don't know because I didn't go to the sale. There's notice was wrong. If I'm told that it's going to be a public sale, I go to the sale. I see who the auctioneer is. I thought, you know, what is your response to opposing counsel's comment that the – and I understood it this way as well, so this to me is an important question. I had understood that the only sale that was still at issue was the sale of the air fires, that the sale of the vehicles was conceded to be done in a commercially reasonable manner. It wasn't conceded. What was conceded was the deficiency, the amount of the deficiency for the autos was conceded. Yes. Applying what you got from the sale to what is owed on those, that is the deficiency. Okay. In the statement of uncontroverted facts, you agree that there was nothing wrong with the sale of the pickups and they thought they were sold in the proper manner. You said the same thing with respect to the trucks. Correct. But we were placed in that situation because of the improper notice. Well, and there's no evidence that they should have fetched more money at auction. I mean, these are all conceded facts. Correct. In your statement of uncontroverted facts. I'm reading right off of it. Correct. But notice, that has nothing to do with the notice. Okay. And the law is clear. Again, the Supreme Court of California has held that you do not, it says, the requirements of Section 94504 are strictly construed. And if you don't follow them, you don't get a deficiency judgment. Pure and simple. And I believe the policy underlying that is, is because you put people in an impossible situation, as my client is now, where he's not given proper notice of the sale. He can't, there is no evidence that it was done, from our point of view, correctly or incorrectly because we didn't go to there. Normally you go to it. You see the sale. You say, yes, this is a reputable company. Okay, I see what they got, et cetera, et cetera. If you don't give the proper notice, the person is placed in an impossible situation to refute the reasonableness of that sale. And therefore, I mean, again, Supreme Court authority says, along with many other jurisdictions, if you don't meet those strict requirements of notice, you're not going to get your deficiency judgment. But, again, we never got to these issues below because the court incorrectly held that it was Article 10. So I would ask that it be reversed and be remanded for further proceedings consistent with a holding that it is not a lease, it is a sales agreement, and therefore Article 9 applied. Then we can do what we have to do and present our arguments once we know that, in fact, it is a sales agreement and not a lease. Okay. Thank you, counsel. Anything else? No. Okay. For your argument, both of you in the matter just argued will be submitted. Okay. Thank you very much. All right. And we'll next hear argument in United States v. Cook. Thank you.
judges: Rymer, Graber, Molloy